Polaski *v.* Levin, Appellant.

Argued March 25, 1954. Before Ross, Gunther, Wright, Woodside and Ervin, JJ. (Rhodes, P. J. and Hirt, J., absent).

*Louis Waber,* for appellee.

Opinion by Ross, J., September 28, 1954:

This is an action of trespass brought by Martin Polaski against Albert Levin and Miriam S. Levin, his wife, to recover the sum of $600. After trial in the Municipal Court of Philadelphia County, the jury re-

turned a verdict for plaintiff in the amount of $600. Defendants' motions for judgment n.o.v. and for a new trial were overruled by the court below and this appeal was taken by defendants.

With controverted facts and inferences arising therefrom resolved in plaintiff's favor, the circumstances which gave rise to the instant action may be summarized as follows: The wife defendant was the owner of an Oldsmobile sedan. On June 13, 1949 an advertisement appeared in a Philadelphia newspaper which read in part: "Olds. '42 sedan, R. & H. Hydramatic. Bought new in '44. New white wall tires. Good cond. Must sell immed. Need cash. . . ."

In response to the newspaper advertisement plaintiff visited the defendants' home to look at the automobile. Plaintiff testified: "Mr. Levin told me the car was in good condition, and I wouldn't have any trouble with it for about a year. . . . I said, 'I would like to get a mechanic to look at the car.' He said, 'You don't need a mechanic. I will take you for a ride.' He took me for a ride for four or five blocks. I said, 'I would like to have a mechanic.' He said, 'You don't need a mechanic. The car is in good condition.' "

After the ride plaintiff noticed that the car had an "old inspection sticker" on it. He then offered to give the husband defendant a $10 "deposit" against the agreed price of $650 if the defendants could get the car "legally inspected". Some time later plaintiff was informed by the husband defendant that the car had been inspected. Plaintiff went to the defendants' "place of business", "noticed the new sticker" and gave the husband defendant $640. Because plaintiff was "not familiar in shifting the hydramatic" he did not then drive the car; instead, the wife defendant drove him to his home, a distance of about 30 blocks.

Plaintiff testified: "It took about four or five days for the registration plates to come through. When they arrived, I put the tags on the automobile ready to go to work. I noticed a big puddle of some fluid underneath the car . . . and I noticed the car didn't pull away with the power it should have." Thereupon plaintiff took the car to a garage, where it was examined, and it was determined that the car required the expenditure of nearly $450 for parts and labor "necessary to pass State inspection". On June 27, 1949 plaintiff complained to the Pennsylvania State Police "that a car he had purchased on the 13th of June, 1949, from Miriam S. Levin . . . was in bad condition, and had displayed a new inspection sticker". A state policeman directed plaintiff to take the car to another garage where the policeman and a garageman examined it. The officer, testifying for the plaintiff, stated that the state inspection procured by the defendants was, in his opinion, "illegal", that "I don't believe from my experience those defects could have happened in that period of time which elapsed between the time the car was inspected and the time that I examined it".

Thereafter plaintiff took the car to the garage of the 22nd Street Auto Body Company, where it remained for a few months. He was informed by the Auto Body Company that he "would have to pay additional storage charges, or they would give me $50 for the car". He testified: "I was compelled to sell the car to the 22nd Street Auto Company for the sum of $50. I sustained a loss of $600."

In its charge the trial court stated to the jury: "If you find . . . that the defendants did do that which they should not have done, insofar as guaranteeing the car was in good condition, and intentionally hid defects from the plaintiff, of course, the plaintiff would be entitled to damages; to the amount of money that he suf-

fered loss from, $600 . . . If you find the plaintiff was taken advantage of . . . that he relied wholly and solely upon the statement of the defendant that the car was in good condition after he had ridden in it for some time, of course, you will find for the plaintiff in the amount of damages he claims." Defendants took no exception to the charge.

The plaintiff in stating the questions to be argued before this Court takes the position that the evidence justified a finding by the jury that defendants "perpetrated a fraud" upon him. Defendants agree that one question in the case is whether "the evidence in this case was sufficient in law to support the Jury's finding of fraud". The above-quoted excerpts from the charge of the trial court indicate that the case was submitted to the jury on the theory that defendants had or had not perpetrated a fraud upon plaintiff, depending upon the view they took of the conflicting testimony. Thus it is clear that this has been from the inception, and is now, an action of deceit for fraud sounding in tort and not in contract.

Accepting, as we must, plaintiff's version of the transaction, it cannot be said that he failed to make out a case of fraud. "One who suffers damage by being deceived into action or inaction through another's intentional and calculated misstatements of material fact may recover at common law from his deceiver." *Crawford v. Pituch*, 368 Pa. 489, 493-494, 84 A. 2d 204. "In order to maintain an action for deceit, plaintiff must show a fraudulent misrepresentation of fact, made with the intention that it should be relied upon, and that it actually was relied upon to its loss . . . Since the tort on which the action is based is the defendant's deceit, it was necessary to prove actual fraud . . . Fraud is proved when it is shown that the false representation was made knowingly, or in con-

scious ignorance of the truth, or recklessly, without caring whether it be true or false . . . Of course, it is not necessary—nor indeed is it always possible—to prove fraudulent intent by direct evidence; such intention may be proved, for example, by showing that the misrepresentation was made under circumstances which indicate that it was a reckless assertion in entire ignorance of the fact . . ." *Warren Balderston Co. v. Integrity Trust Co.,* 314 Pa. 58, 60-61, 170 A. 282.

Fraudulent intent can clearly be inferred from the circumstances that the defendants, after stating that the automobile was in good condition (which apparently it was not), dissuaded plaintiff from having the car examined by a mechanic prior to the sale, and that defendant procured an illegal state inspection to clothe the vehicle with the indicia of soundness.

Plaintiff was, therefore, entitled to recover from defendants the amount of loss suffered by reason of their deceit. We cannot agree, however, with the court below that he "sustained a loss of $600.00, which was the immediate and proximate result of the fraud practiced upon him . . ." We are of the opinion that the court below committed fundamental error when it instructed the jury that if defendants represented the automobile to be in good condition and "intentionally hid the defects from the plaintiff", he, plaintiff, "would be entitled to damages; to the amount of money he suffered loss from, $600."

The common law action of deceit has been recognized in this Commonwealth for more than a century and a half. *Crawford v. Pituch,* supra, 368 Pa. 489, 84 A. 2d 204. In *Thompson v. Burgey,* 36 Pa. 403, a horse which was a "wind-sucker or crib-biter" was represented to be "all right" by a seller aware of the animal's defect. The trial court charged the jury as follows: "If the defendant concealed from the plain-

tiff a known and latent vice or habit, which the plaintiff had not the opportunity of discovering before he made the purchase, and which detracted from the value of the horse, then the plaintiff would be entitled to recover damages; and *the proper measure of damages would be the difference between the value of this horse addicted to the habit of wind-sucking, and his value if he had been free from such habit."* (Italics supplied.) The Supreme Court approved the charge as it related to the measure of damages. *Stetson v. Croskey,* 52 Pa. 230, was an action for deceit in the sale by defendants to plaintiff of a ship. The ship was worm-eaten and the defendants knew it but stated to the plaintiff that she was not. The Supreme Court stated at page 231: "Assuming the fraud to have been proved, the damages recoverable were to be measured by the difference between the value of the vessel as she was represented to be and her value as she really was. There was no other standard. What it would cost to repair the vessel and put a new bottom upon her (the evidence submitted at first to show the amount of damages), was pertinent only because it tended to prove the difference in value between the vessel as she was, and what her value would have been if the representation of the plaintiff [defendant] had been true."

Later cases state the proper measure of damages for deceit in the sale of property substantially the same, that is, the difference between the real, or market, value of the property at the time of the transaction and the higher, or fictitious, value at which it was purchased: *Peters v. Stroudsburg Trust Co.,* 348 Pa. 451, 35 A. 2d 341; *Emery v. Third National Bank of Pittsburgh,* 308 Pa. 504, 162 A. 281; *Bishoff v. Valley Dairy Co.,* 302 Pa. 125, 153 A. 133; *Hoagland v. Mulford,* 298 Pa. 588, 148 A. 864; *Long v. McAllister,* 275 Pa. 34, 118 A. 506 (all involved the sale of stocks and bonds);

and *Browning v. Rodman,* 268 Pa. 575, 111 A. 877 (land).

In the case at bar there was no evidence of value of the automobile in "good condition" at the time of the transaction, nor was there evidence of its value in its actual, or defective condition. In the absence of such evidence there was no way for the jury to arrive at the loss sustained by plaintiff. Simply because the parties agreed on a purchase price of $650 and because plaintiff subsequently saw fit to dispose of the car for $50 does not establish a loss of $600.

Judgment reversed and a new trial awarded.